**Sarah M. HARRIS, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 84–1703.

United States Court of Appeals, Fifth Circuit.

July 8, 1985.

Jones & Brutsche, M. Bruce Peele, Larry R. Jones, Dallas, for plaintiff-appellant.

James A. Rolfe, U.S. Atty., Fort Worth, Tex., Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Appellate Section, Tax Div., William S. Estabrook, Michael J. Roach, Dept. of Justice, Washington, D.C., for defendant-appellee.

Jay M. Goltz, Dallas, Tex., interested party for John A. Harris.

Before REAVLEY, JOHNSON and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

The United States has prevailed in enforcing, against the sale proceeds of Sarah M. Harris' community property and homestead, its lien for taxes owed by her spouse. She initiated the action below because the United States refused to release its tax lien against the proceeds of the sale of her former residence located in Dallas, Texas. Harris argues that the summary judgment should be reversed because the lien in favor of the United States is invalid against her homestead interest in the property. She contends that, even if the lien is valid, her interest in the property is superior to the interest of the United States. Alternatively, she argues that the district court incorrectly valued her one-half interest in the homestead, which was protected under the holding in *United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983). We affirm.

## I. Facts

John and Sarah Harris were married in 1973. In 1977 they purchased their residence by some cash and a mortgage. The proceeds from the sale of that residence are the subject of this dispute between Sarah Harris and the United States.

On October 28, 1977, John Harris incorporated Pal Drilling Company to engage in drilling for oil and gas. He incorporated Pal Production Company to operate any oil and gas wells that might be discovered. He also formed J.H. Development Company, a sole proprietorship, to buy oil and gas leases and to syndicate drilling ventures. These entities shared a single office and were all managed by John Harris.

During the first three quarters of 1978, Pal Drilling Company failed to remit to the United States federal taxes that were withheld from the wages paid to its employees during those quarters. Pal Drilling Company also failed to pay its tax due for the 1978 tax year under the Federal Unemployment Tax Act. On August 3, 1978, Pal Drilling Company owed to the United States taxes and accrued interest totaling $36,112.14. On November 13, 1978 and February 19, 1979, the Internal Revenue Service (IRS) assessed against Pal Drilling Company the $36,112.14 in unpaid taxes and interest.

On August 3, 1978, Pal Drilling Company and John Harris d/b/a Pal Drilling Company, Pal Production Company, and J.H. Development Company filed a Chapter 11 peti-

tion in bankruptcy. A Plan of Arrangement proposed by John Harris was filed in the bankruptcy court on April 13, 1978. The Plan provided that any claims by the IRS would be paid from the personal assets, including homestead property, of John Harris. On April 19, 1979, the IRS filed a proof of claim in the bankruptcy proceedings for the delinquent taxes and accrued interest.

On May 17, 1979, John Harris and the United States executed a Stipulation for Payment of Federal Taxes in which Harris admitted that the United States' claim for $36,112.14 should be allowed in full. He also admitted that Pal Drilling Company was his alter ego and that he had received notice of the assessments by the IRS. The IRS filed its federal tax lien securing its claim on June 22, 1979.

The state court hearing on the divorce of Sarah and John Harris was held on June 7, 1979, and the judge announced the ruling from the bench. The court's written judgment was entered on July 13, 1979, providing that Sarah and John would retain the personal property in their possession. The couple's residence was awarded to Sarah, as her separate property, subject to a $4,500 lien in favor of John.

Sarah Harris sold her Dallas residence in September 1982, receiving $158,000 after costs of sale. The IRS claimed an interest in the proceeds, asserting its lien against the property of John Harris. In response, Sarah Harris filed the complaint underlying this action and deposited $70,000 in an interest-bearing escrow account pending resolution of the dispute.

## II. Validity of the Lien

Sarah Harris argues that the United States did not have a valid lien against the property of John Harris because it did not meet the statutory requirements of assessment, *see* 26 U.S.C. § 6203 (1982); 26 C.F.R. § 301.6203–1 (1984), and notice and demand for payment, *see* 26 U.S.C. § 6303(a) (1982); 26 C.F.R. § 301.6303–1 (1984). The lien, if valid, arose at the time of assessment, *see* 26 U.S.C. § 6322 (1982), and attached when demand was made and

the taxpayer neglected or refused to pay the tax due, 26 U.S.C. § 6321 (1982); 26 C.F.R. § 6321 (1984).

The district court concluded that the United States had rendered an assessment against John Harris, relying on properly authenticated assessments, *see* 26 U.S.C. § 7514 (1982); 300 C.F.R. § 7514–1(a)(5)(ii) (1984), against John A. Harris, J.H. Development Company, Pal Production Company, and Pal Drilling Company. The court placed more importance, however, on the fact that John Harris had stipulated in bankruptcy proceedings that Pal Drilling Company was his corporate alter ego and that he had received the requisite notice and demand for payment of the taxes. The court noted that Sarah had produced no competent summary judgment evidence to the contrary. Concluding that a taxpayer and his corporate alter ego were not entitled to separate notices, the district court held that the United States had a valid lien against the property of John Harris, 588 F.Supp. 835 (N.D.Tex.1984).

Sarah contends that the district court erred in concluding that the United States rendered an assessment against John Harris. While there was a stipulation, apparently erroneous, that no separate assessment was made against John Harris, the summary judgment proof was that John Harris had stipulated in bankruptcy proceedings that Pal Drilling Company was his corporate alter ego. John admitted that he had so stipulated in his deposition testimony below. Sarah contends that a material issue of fact exists regarding the question whether Pal Drilling Company is the corporate alter ego of John Harris because, under *United States v. Creel*, 711 F.2d 575, 578 (5th Cir.1982), the separate taxable identity of Pal Drilling Company cannot be ignored. Whether or not Pal Drilling Company was a separate taxable entity is not the same question as whether it was an alter ego for the purpose of piercing the corporate veil. *See Id.* at 579 & n. 7.

■ Sarah further contends that the district court erred in concluding that a taxpayer and his corporate alter ego are not entitled to separate notices. We disagree. Although a separate assessment may not have been rendered against John Harris, it is undisputed that notice of assessment and demand for payment were received by Pal Drilling Company. We agree with the reasoning of the Tenth Circuit in *Marvel v. United States*, 719 F.2d 1507, 1513 (10th Cir.1983). John Harris, sole stockholder and manager of Pal Drilling Company, could not seriously contend that notice to Pal did not operate as notice to him. *See id.* We believe that the assessments, issued in the name of Pal Drilling Company, were effective against John Harris. *See also Valley Finance, Inc. v. United States*, 629 F.2d 162, 169 (D.C.Cir.1980) (alter ego of corporation not entitled to separate notice of deficiency).

■ Sarah further argues that the stipulation executed by John was a unilateral encumbrance of the homestead, which is void under Tex. Const. art. XVI, § 50, or as the incurrence of a debt after the filing of a petition for divorce, proscribed by Tex. Fam.Code Ann. § 3.57 (Vernon 1975). We see it differently. As discussed above, the stipulation merely provided summary judgment evidence indicating that Pal Drilling Company was John's corporate alter ego. The fact was taken as established because Sarah failed to submit evidence to the contrary. All of John's property was therefore subject to the IRS tax lien. The liability of Pal Drilling Company for the unpaid employment taxes arose by virtue of its statutory duty to collect and remit the taxes. *See* 26 U.S.C. §§ 3101, 3102, 3301, 3402 (1982). John's admission of liability for those taxes did not constitute an encumbrance of the homestead or the incurrence of a debt.

■ Finally, relying on 26 U.S.C. § 6323(a) (1982), Sarah argues that the tax lien, if it exists, is subordinate to her interest in the property because it was not filed until she "purchased" it through the divorce proceeding. The district court rejected this argument, concluding that the division of property by the divorce court was a division of marital property rights, not a sale. We agree. Texas courts do not attempt in divorce proceedings to divide marital property in an equal manner; they strive for a division that is "just and right." *See* Tex.Fam.Code Ann. § 3.63(a) (Vernon 1975); *see also* 13 Tex.Tech.L.Rev. 712 (1982). A substantially disproportionate exchange of marital property upon divorce may be considered a taxable event. *See Siewert v. Commissioner*, 72 T.C. 326 (1979). The fact that tax consequences may attach to such a transaction, however, do not convert it into an exchange "for adequate and full consideration in money or money's worth." *See* 26 U.S.C. § 6323(h)(6) (1982) (defining "purchaser" as one who acquires property for adequate and full consideration). We affirm the district court's holding that the United States held a valid tax lien against the homestead of John Harris, unimpaired by the transfer of his rights through the divorce proceedings.[1]

### III. Valuation of the Homestead

■ Sarah Harris argues, alternatively, that even if the United States had a valid lien, the district court erred in valuing her one-half interest in the homestead at an amount equal to one-half the proceeds from the sale of the house. She relies on dictum from *United States v. Rodgers*, 461 U.S. 677, 698, 103 S.Ct. 2132, 2145, 76 L.Ed.2d 236 (1983), in arguing that the district court undervalued her homestead interest.

---

**1.** The United States urges on appeal that Sarah Harris abandoned her interest in the homestead when she sold it. At most, a fact issue would exist on this point. Sarah Harris had six months after the sale to reinvest the proceeds of the sale of her homestead, thereby retaining her protected homestead interest. *See* Tex.Prop. Code Ann. § 41.002(b) (Vernon 1984); *Jones v. Maroney*, 619 S.W.2d 296, 297–98 (Tex.Civ.App. —Houston 1981, no writ). No evidence was adduced below regarding her intent to protect her homestead interest in the proceeds of the sale.

In *Rodgers,* the Supreme Court held that the United States can enforce a federal tax lien against the Texas homestead interest of a nondebtor spouse. *Id.* at 690–698, 103 S.Ct. at 2141–45. The Court also held that the innocent spouse must be compensated for the loss under 26 U.S.C. § 7403 (1982). *Id.* at 698, 103 S.Ct. at 2145. The Court was not required to decide the method for compensating the innocent spouse, however, and it did not do so. In dictum and for purposes of illustration, it suggested the following method for valuing the homestead interest of an innocent spouse. First, the Court assumed that a homestead estate is the economic equivalent of a life estate. Next, it assumed that an 8% discount rate in a standard statutory or commercial table would be appropriate for valuing a life estate. Under those assumptions, it found that three nondelinquent or surviving spouses, each holding a homestead estate and aged 30, 50, and 70 years, would be entitled to compensation of approximately 97%, 89%, and 64%, respectively, from the proceeds of the sale of their homesteads. Assuming, but not deciding, that the three spouses had protected one-half interests in the underlying property ownership, the Court suggested that the respective homestead interests would be worth approximately 99%, 95%, and 82% of the proceeds from the sale of their homesteads. *Id.* at 677, 103 S.Ct. at 2132. It is important to recognize here that the Supreme Court, in its example, assumed that only one person or entity had a homestead interest. As explained below, the existence of another homestead interest in the property would have significantly decreased the percentage interests of the nondebtor spouse.

Relying on the above-described writing in *Rodgers,* Sarah argues that the district court undervalued her homestead interest. She urges that application of the formula in *Rodgers* might result in her homestead interest's being valued significantly in excess of 50% of the proceeds from the sale of her residence. To resolve the questions presented, we will examine below the assumptions made in *Rodgers* and also consider the arguments presented by the United States.

In *Rodgers,* the Supreme Court analyzed the Texas homestead estate and concluded that "the homestead laws have the effect of reducing the underlying ownership rights in a homestead property to something akin to remainder interests and vesting in each spouse an interest akin to an undivided life estate in the property." *Rodgers,* 461 U.S. at 686, 103 S.Ct. at 2138–39. The Court recognized that the analogy does not take into account all the nuances of the Texas homestead estate. Specifically, the homestead estate is different from a life estate because it can be lost by abandonment. *Id.* at 2139 & n. 11, 103 S.Ct. at 2139 & n. 11. In its analysis, the *Rodgers* Court pointed out the fact that a Texas homestead estate is not merely a statutory entitlement; it is a vested property right. *Id.* at 686, 103 S.Ct. at 2139.

At oral argument, the United States conceded that it is impossible to place a value on the possibility of abandonment. Likewise, in its brief, the United States computes the value of the homestead estate of Sarah Harris as though it were the economic equivalent of a life estate. Therefore, for purposes of valuing the Texas homestead estate, we will ignore any decrease in value attributable to the possibility of abandonment.

The Supreme Court, in its *Rodgers* example, assumed that the use of a standard statutory or commercial table and an 8% discount rate would be appropriate in calculating the value of the homestead estate. The United States asserts that the requisite factors for valuing the homestead interests here can be found in Treasury Publication 723A, Actuarial Values II: *Factors at 6 Percent Involving One and Two Lives* (1971). Sarah Harris argues that a question of fact exists as to which actuarial table appropriately measures her life expectancy; she does not challenge the use of a six percent rate to value her estate.

We see no reason here to depart from the use of the Treasury tables in determining the value of Sarah Harris' homestead

estate. Although these tables have never attained the force of law, *see Bowden v. Commissioner,* 234 F.2d 937, 942 (5th Cir.), *cert. denied,* 352 U.S. 916, 77 S.Ct. 215, 1 L.Ed.2d 123 (1956), their use in determining the present value of future interests in property has been long recognized and approved by the Supreme Court, *see Simpson v. United States,* 252 U.S. 547, 550, 40 S.Ct. 367, 368, 64 L.Ed. 709 (1920).

The illustration in *Rodgers* was drawn under the assumption that there existed three nondelinquent *surviving* or *remaining* spouses of three different ages. *Id.* at 698, 103 S.Ct. at 2145 (emphasis added). Sarah Harris urges us here to value her estate as though she were a remaining spouse who had acquired the homestead free of any other interest in the property. To understand the fallacy of Sarah's argument, it is important to recognize that the actuarial tables used by the IRS to value Sarah's life estate "properly reflect the fact that the aggregate value of *all* the interests in a piece of property equals 100 percent of the value of the property." Stephens, Maxfield, and Lind, Federal Estate and Gift Taxation, ¶ 4.02[3][i] n. 149 (5th Ed.1983). In this case, the following interests existed in the Harrises' residence. First, at the time of assessment notice and attachment of the lien, Sarah and John owned a joint homestead interest in the residence, which is the economic equivalent of a joint life estate. Second, Sarah and John each owned a contingent homestead interest or life estate, which would become a possessory interest in favor of the surviving spouse. Finally, Sarah and John jointly owned the remainder interest in the property. Under *Rodgers,* only the homestead interests of Sarah are protected and thus compensable upon foreclosure and sale.

By virtue of its lien on the property of John Harris, the IRS was entitled to the value of John's interest in the homestead to the extent of its lien. *See* 26 U.S.C. § 6342 (1982). The IRS was also entitled to the remainder interest in the property at the termination of Sarah's life estate. The joint-life tables account for the fact that more than one person has an interest in the life estate, *see* 20 C.F.R. § 2031–10(e) (1984) (explaining that special factors must be used to value concurrent interests involving one or more lives), and they should have been used here to value Sarah's homestead interest properly.[2]

■ The attorney representing Sarah Harris also contended at oral argument that Sarah's community property was not subject to the debts of John Harris. It is settled law in Texas, however, that debts contracted during marriage are presumed to be debts of the community, absent evidence that the creditor agreed to satisfy the debt solely from the separate property of the contracting spouse. *See Cockerham v. Cockerham,* 527 S.W.2d 162, 171 (Tex. 1975). No such evidence was submitted below and we may therefore apply the presumption here.

In an order denying Sarah Harris' objection to the entry of summary judgment, the district court refused her request for judicial valuation of her homestead interest. The court's order stated that she had received outright one-half of the sales proceeds from the residence. Concluding that her interest could not exceed her one-half share in the community property and finding that the escrowed funds at issue were from the other one-half of the sale's proceeds, the court refused to grant relief.

2. The single-life tables indicate the value of a life interest and a remainder interest of the single owner. *See* 20 C.F.R. § 2031–10(f) (1984). If these tables were used to value the joint-life interests of a husband and wife, each 40 years of age, in a residence valued at $100,000, the following results would obtain. First, the husband's life estate would be worth 78.923% of the value of the residence, or $78,923. His remainder interest would be 21.077% 764 F.2d—26

or $21,077. The husband's life and remainder interests would total $100,000, the value of the residence. The wife's life estate would be worth 84.281% of the value of the residence or $84,281. Her remainder interest would be worth 15.719% or $15,719. Therefore, her total interests would also be worth $100,000, or 100% of the value of the house. Sarah's joint homestead estate cannot be valued as if it were a single life interest.

It is not entirely clear from this record whether Sarah actually received $88,000 in excess of the original mortgage on the home, but she stated in her deposition that, in addition to the $70,000 deposited in escrow, she had $88,000 remaining from the sale "after attorneys' fees and closing fees and everything was taken out." Even if we assume that Sarah had to pay the full amount of the original mortgage of $80,000 from the $88,000 she received, she will receive an amount in excess of her interest in the homestead, as computed by the United States.[3] She will be entitled to the $33,887.86 remaining after the United States satisfies its lien of $36,112.14 from the $70,000 in escrow. *See* 26 U.S.C. § 6342(b) (1982). Together, the $8,000 she would have after satisfying the mortgage and the $33,887.86 remaining from the $70,000 total $41,887.86, or approximately 54% of the original proceeds.[4] If the mortgage was paid before she received the $88,000, she will receive funds totaling $121,887.86, or approximately 77% of the original proceeds.[5] Because Sarah's homestead interest in the proceeds will not be impaired in any event and because the United States did not cross-appeal, we affirm the judgment below.

AFFIRMED.

---

3. Applying John's approximate age of 52 and Sarah's age of 43, the United States computes Sarah's homestead interest to be 50.98%, according to the tables provided in Treasury Publication 723A.

4. Under the stated assumptions, the original net proceeds would have been $158,000 (sale price of home) less $80,000 (original balance of mortgage), or $78,000.

5. Under the stated assumptions, the original net proceeds would have been the $88,000 in Sarah's possession plus the $70,000 in escrow, or $158,000.