**In re Carolyn GILLESPIE.**

**No. 00–51469S.**

United States Bankruptcy Court,
E.D. Arkansas,
Pine Bluff Division.

Nov. 16, 2001.

Kimberly Wood Tucker, Wright, Lindsey & Jennings, Little Rock, AR, for debtor.

Joseph A. Strode, Bridges Law Firm, Pine Bluff, AR, for Agribank.

Walter Dickinson, Little Rock, AR, Chapter 7 Trustee.

William Meeks, Streetman & Meeks, Crossette, AR, for Chapter 7 Trustee.

### ORDER SUSTAINING OBJECTIONS TO EXEMPTIONS

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE is before the Court upon objections to exemptions filed by the chapter 7 trustee and the creditor, Agribank. In light of the irregularities in the manner in which the debtor conducted her financial affairs, the clerk will be directed to forward a copy of these findings to the United States Attorney for the Eastern District of Arkansas as well as the federal and state taxing authorities.

In 1993, the debtor's adult son died intestate. Following the son's death, there was apparently a great deal of disagreement between the debtor and her former spouse, the father. In an effort to ensure that her heirs never had to face similar disputes, she sought legal counsel. Rather than simply providing for disposition of her assets in a will, she formed an irrevocable trust and placed not only all of her assets into this trust, but also many of the assets of her current husband, including:

1. All of the shares of WSPS, Inc., a corporation which owned and operated a liquor store;

2. All of the shares of Cal–Ric, Inc., a corporation which owned a resort condominium in Hot Springs, Arkansas, a rental house, a certificate of deposit, a GNMA security, her residence, and an unimproved parcel of land adjoining her residence.

3. All of the shares of Hard Times, Inc., the farming entity operated by her husband.

Pursuant to the terms of the trust, all of the income from the trust is to be paid to the debtor annually. None of the principal is to be paid to her. Upon her death, the

trust is to be "held, administered and distributed to or for the benefit of" her husband, Ronnie Gillespie. Specifically, he is to receive income on a quarterly basis. The principal is to be distributed to him only if it is necessary for his support. At Ronnie Gillespie's death, the assets are to be distributed to her remaining son or his heirs. Carolyn Gillespie is the creator, settlor, beneficiary and trustee of the Carolyn Gillespie Trust. Although the trust is dated the 27th day of February 1997, the signature information indicates that it was executed on the 12th day of July of an unstated year.

Carolyn Gillespie was purportedly advised that the corporations, now owned by the trust, should be operated in the same manner as they always had been. In that manner, each corporation retained its own bank account and, apparently, its own set of books. The corporations continued to file separate tax returns, but, despite the purported transfer of ownership, the tax returns continued to reflect that Carolyn Gillespie and Ronnie Gillespie, were the shareholders of the corporation. It was not until the 1999 tax returns were filed in September 2000, on the eve of the filing of the chapter 7 petition, that the returns reflected that the corporations were owned by the Carolyn Gillespie Trust.

When dealing with other business entities, and particularly when seeking loans, the Gillespies neglected to advise the potential lenders that the trust was the purported owner of their assets. For example, when Carolyn Gillespie sought a loan to purchase her automobile, she claimed that all of the assets held by the trust in fact belonged to her.[1] In that application, she also claimed that, as the liquor store owner, she received a salary of $60,000.[2]

Carolyn Gillespie operated, through WSPS, a liquor store. Although she worked in the store forty to sixty hours per week, she drew no salary from that operation. Rather, she simply took monies "in lieu of salary" as needed for household expenses. Although Ronnie Gillespie did all of the work for the entity Hard Times, Inc., and labored at the liquor store, he took no salary. Rather, Hard Times, Inc. and the other entities paid his personal expenses, including a rather exorbitant cost for his membership in a duck club. The Gillespies simply considered that they were working for these entities and thus deserved "compensation for [their] work." The compensation, however, was apparently not wages because neither the corporations nor the trust ever issued any W-2's to the Gillespies. The corporations withheld no income taxes or FICA taxes and did not pay FICA taxes. The Gillespies also did not report the "compensation" as income on their individual income tax returns or pay any self-employment taxes. Rather, they caused the corporations to fund their living expenses without regard to the federal or state tax laws or other laws governing the activities of corporations and trusts.

Just as the corporations funded the Gillespies' personal and luxury expenses, the corporations funded each other. If the

---

1. There is currently pending for trial a separate adversary proceeding, *Agribank v. Gillespie*, No. 01–5021 (Bankr.E.D.Ark.) in which the plaintiff seeks a determination that the debtor's obligation to it is nondischargeable because the debtor submitted a false financial statement. Among the allegations in the complaint are the assertions that the debtor falsely claimed that she owned the liquor store from which her income was derived, claiming that entity earned an annual gross income of $230,000.

2. The debtor's testimony that she believed that form requested the gross income of the business is not credible. She is not that unsophisticated. Nor is the form ambiguous.

obligations of one corporation were due but that corporation did not have enough funds, the debtor simply moved funds from the account of one corporation into the account of the needy entity. Similarly, there was no discernable respect for the trust entity. Funds from the corporations, owned by the trust, were funneled to Carolyn or Ronnie Gillespie as they wished. They did not distinguish between the trust income and *res*. Carolyn Gillespie simply directed the income or other property of the trust into her and the corporate accounts for her expenses as she desired, in contravention of the terms of the trust and the tax laws.

Just prior to the filing of her chapter 7 petition in bankruptcy, the debtor closed her personal bank account and opened an account in the name of the Carolyn Gillespie Trust. Although the account was opened in the name of the trust, this was admittedly the debtor's personal account[3] and was used to pay all of her and her husband's personal and household expenses. Ronnie Gillespie did not have a bank account in his name because he owes substantial sums to the United States for federal income taxes.[4]

In March of 1998, Carolyn Gillespie and her husband, Ronnie, obtained a loan from Agribank for the farming operation, Hard Times, Inc., and subsequently defaulted on that loan. The Gillespies signed a consent judgment in September 2000. This is the only obligation listed on her schedules for which she appears to be liable. The only other debts listed are medical expenses of her husband, Ronnie Gillespie.[5]

Approximately one month after opening the trust bank account and filing tax returns which, finally, reflected the trust's ownership of the various corporations, that the debtor commenced this chapter 7 case, listing as her only unsecured debt the loan to Agribank. She listed a little over $2,000 as expenses for payments on her secured obligations, all of which were to be reaffirmed. These included $355 per month for a boat, $432 for a car, and $1,200 for mortgages on her residence and a condominium. The debtor scheduled as personal property her interest in two IRA's and her interest in the Carolyn Gillespie Trust with an unknown value. She claimed an exemption in these three items.

Both the trustee and Agribank objected to the claim of exemption in the IRA's and the Trust,[6] asserting that the IRA's are not reasonably necessary for the debtor's support and that, since she is the settlor, trustee and beneficiary of the trust, the entire trust *res* is available to the trustee. Specifically, they assert, since the full *res* is available to the debtor, that it is property of the estate and, thus, available for

---

**3.** The debtor denied the existence of this bank account in her deposition and in a letter from her attorney to the trustee.

**4.** Ronnie Gillespie apparently owes over $120,000 in taxes accruing from debt forgiveness from the U.S. Department of Agriculture. It was after he incurred this obligation that the Gillespies began filing separate tax returns. Moreover, it was after the buy-out by the USDA that Hard Times, Inc. was formed.

**5.** It is an interesting point of Arkansas law that, while a husband is obligated for the necessary expenses of his wife, *Davis v. Baxter*

*County Regional Hosp.*, 313 Ark. 388, 855 S.W.2d 303 (1993), the reverse is not true, *Medlock v. Ft. Smith Serv. Fin. Corp.*, 304 Ark. 652, 803 S.W.2d 930 (1991). Thus, Carolyn Gillespie may not be legally obligated to pay these expenses.

**6.** The trustee and Agribank also objected to the debtor's claim of exemption in other, personal items, because they could not verify the accuracy of the values. They did not prosecute their objection to the claim of exemptions in these items and, thus, the Court does not address these issues.

liquidation and distribution to the creditors. The debtor asserts that the trust is valid and enforceable. Although she concedes that the spendthrift provision of the trust is ineffective, she argues that the trustee can reach only the income of the trust to the extent the income exceeds her valid exemption and that the trust *res* cannot be reached by the trustee. Further, argues Gillespie, the value of the income is negligible.

## I.

At the time the debtor transferred her assets into the trust, she made a transfer of property which, it appears, comported with Arkansas law. Her subsequent treatment of the assets of that trust and the extent to which she commingled her assets, the assets of the husband, and the assets of the corporations held by the trust, however, raise significant questions which shall be addressed below.

█ When the debtor filed her chapter 7 petition, all her property and rights to property became property of the estate. 11 U.S.C. § 541(a). With the filing of the petition, the debtor was entitled to claim exemptions to remove certain of those assets from the estate. Moreover, section 541(c)(1) provides that certain property, essentially in the nature of spendthrift trusts, do not become property of the estate in the first instance.[7] *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). The trustee and Agribank assert that since the spendthrift provision of the trust is invalid, the trustee may reach all of the assets of the trust. They assert, therefore, that since the

spendthrift provision is invalid, the entire trust is invalid, citing *Halliburton Co. v. E.H. Owen Family Trust*, 28 Ark.App. 314, 773 S.W.2d 453 (1989)(en banc); *see Simmonds v. Larison (In re Simmonds )*, 240 B.R. 897 (8th Cir. BAP 1999)(dual role of settlor and beneficiary brought debtor's beneficial interest in the trust into the estate).

In *Halliburton*, as in this case, the debtor was the settlor, trustee, and a beneficiary. The distinguishing features of the *Halliburton* trust, however, are that the debtor was the beneficiary of the corpus, had the right to distribute the corpus to himself if he desired, and could transfer title of property held by the trust. In contrast, under the terms of the Carolyn Gillespie Trust, Carolyn Gillespie is a beneficiary only of the income of the trust and, nominally at least, does not have the right to revoke, distribute the corpus, or transfer title of the trust property.[8] In *Halliburton*, the deciding factor was that Halliburton could reach the trust *res* at his discretion. In this case, looking solely to the terms of the trust, the debtor does not have the right to reach the corpus of the trust.

Moreover, the court does not agree that the trust provides Carolyn Gillespie with the unfettered discretion to deal with the trust *res*, as asserted by Agribank. Section 5.3 of the trust provides:

**Application of Trust Property.** No person dealing with the Trustee shall be obligated to see to the application of any money, or any other property paid or delivered to the Trustee, or to inquire into the Trustee's authority or power or

---

7. As a practical matter, however, debtors will generally claim items under section 541(c) as exempt in order to ensure that the trustee and any other parties in interest have notice that the debtor claims that property is not reachable by the trustee.

8. The fact that she commingled those assets with her own and with her husband's assets, and in fact treated the property as her own has separate legal consequences, discussed *infra*.

into the expedience or propriety of any transaction consummated by the Trustee.

This appears to be a provision which exempts others transacting business with the trust from ensuring that the trustee is performing her obligations. It does not grant to the trustee unfettered discretion to deal with the trust assets at her will. It also does not preclude any other beneficiary from inquiring or seeking to enforce any rights that a beneficiary may have with regard to the trust. The fact that the debtor apparently did not comply with the terms of the trust or may have entered into transactions beyond her capacity and authority does not alter the written provisions of the trust or their legal effect.

Arkansas law clearly provides, however, that the spendthrift provision is invalid, and the debtor concedes this issue. While it is true that the spendthrift provision in the trust is invalid, it does not necessarily follow that the entire trust is invalid or that the entire *res* is available to the chapter 7 trustee or creditors. Rather, as the debtor admits, the fact that the spendthrift trust is invalid makes the *debtor's interest* in the trust subject to reach by creditors, including the chapter 7 trustee. *See In re Hartman*, 115 B.R. 171 (Bankr.W.D.Ark. 1990). The question before the Court, thus, becomes the extent of the debtor's interest in the trust, or in its assets. The debtor asserts her only interest in the trust is the income that is distributed to her which she claims is negligible, and that she has no interest in the assets of the trust, *i.e.*, the corporations held by the

trust. After hearing all of the evidence, the Court disagrees.

■ It is at this juncture of the analysis that the debtor's actual use and control of the trust assets must be analyzed. The court concludes, as urged by the trustee and Agribank, that the trust is a sham and must be disregarded for purposes of this bankruptcy case. Since the trust is a sham, and essentially the alter ego of the debtor, the debtor's interest is the entirety of the trust and, thus, the trust, and all of its assets, become property of the estate.[9]

■ It is well settled that if an entity is the "alter ego" of an individual, the assets of the entity may be determined to be the assets of the individual so that an injured individual may reach those assets to satisfy a claim. That is, the individual's creditors may reach property which ostensibly belongs to a third entity if that entity is the alter ego of the individual. *See generally Winchel v. Craig*, 55 Ark.App. 373, 934 S.W.2d 946 (1996)(en banc); *Woodyard v. Arkansas Diversified Ins. Co.*, 268 Ark. 94, 594 S.W.2d 13, 17 ("[C]ourts will ignore the corporate form ... where fairness demands it."); *Towe v. Martinson*, 195 B.R. 137 (D.Mont.1996). If an entity is so managed and controlled by an individual as to constitute a sole proprietorship, the entity is the alter ego of the individual. Although the doctrine is most often applied with regard to corporations, it also applies to trusts. *Vaughn v. Sexton*, 975 F.2d 498, 504 (8th Cir.1992), *cert. denied*, 507 U.S. 915, 113 S.Ct. 1268, 122 L.Ed.2d 664 (1993). Generally, in determining whether an entity is an individu-

9. There is no impediment to the chapter 7 trustee or Agribank making this assertion as it is not an action by the trustee seeking to obtain judgment on behalf of the creditors. *See generally Constellation Dev. Corp. v. Dowden, (In re B.J. McAdams)*, 66 F.3d 931 (8th Cir.1995), *cert denied*, 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996), *distinguishing Mixon v. Anderson (In re Ozark Restaurant Equip. Co.)*, 816 F.2d 1222 (8th Cir.), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987). *See also Towe v. Martinson*, 195 B.R. 137 (D.Mont.1996).

al's alter ego, the courts apply a totality of the circumstances test, looking to:

  \* whether there is respect for the corporate or entity formalities;

  \* whether there is commingling of entity and personal funds and expenses, including a use of the entity's assets for personal purposes; and

  \* the family relationship between the officers/trustees and the individual.

*Horton Dairy, Inc. v. United States,* 986 F.2d 286, 289 (8th Cir.1993).

In this instance, the evidence is overwhelming that the Carolyn Gillespie Trust is, in reality, the alter ego of Carolyn Gillespie. The trust functioned merely as an appendage of Ms. Gillespie and her various businesses. There was no respect for separate corporate or trust identities with regard to either assets or expenses. Even the testimony before this court was similar to that quoted by the Eighth Circuit Court of Appeals in *Horton Dairy:* "it was just all the same money.... It was just back and forth." *Id.* at 289. Similarly, as in *Horton Dairy,* the only evidence that the trust or corporate entities even existed were the documents which created them. For all other purposes, the trust and corporations were virtually nonexistent. There were no meetings of the officers or boards of the corporations, and assets—primarily cash—were freely transferred among the corporations for either business or personal purposes, without regard to any formalities or even thought as to the corporate or trust entities. Carolyn Gillespie freely admitted that the bank account opened in the name of the trust was her personal account. The trust formalities had no meaning to her.

Not only did she ignore formalities with regard to the trust, she was oblivious to the distinction between the trust *res* and the income, despite the fact that, as trustee, she was obligated to respect those separate concepts and interests. Her testimony indicates that she did not even consider that the distinction had any importance. She considered the assets of the trust, including the corporations and their assets, to be hers for all purposes.

It is noteworthy that not only did all of the assets originate with Carolyn Gillespie and her husband, Ronnie Gillespie, but the income was distributed to both of them. Although the assets were intended to descend to her son, Ronnie Gillespie's assets were also part of the trust. Although the trust provided only for distribution of income to Carolyn Gillespie, the debtor's testimony evidences that the trust also paid income to Ronnie Gillespie.

    The case authority in Arkansas, *see Horton Dairy,* 986 F.2d 286, in contrast to some jurisdictions, *see, e.g., Stover v. Fulkerson (In re Bruening),* 113 F.3d 838 (8th Cir.1997)(applying Missouri law); *Towe v. Martinson,* 195 B.R. at 144, (Montana law) does not require a finding that the corporate or trust "cloak" is used as "a subterfuge to defeat public convenience, justify wrong, perpetrate fraud, or to defend a crime." Rather, the Arkansas Supreme Court has phrased the requirement as requiring an "abuse" of the entity which injures another, *Winchel v. Craig,* 55 Ark. App. 373, 934 S.W.2d 946, 950 (1996). Alternatively, the Arkansas Supreme Court has sanctioned application of the doctrine where: (1) fairness demands it; (2) it is necessary to prevent wrongdoing; and (3) the entity is a mere tool of the parent, *Woodyard v. Arkansas Diversified Ins. Co.,* 268 Ark. 94, 594 S.W.2d 13 (1980).

The court has no difficulty in making the findings of abuse or subterfuge under any of the cited standards. Indeed, the evidence is overwhelming that the use of the trust, and, indeed, the assets of the corporations, caused injury to others. The

debtor shielded her assets by the use of the entities but assumed no responsibilities associated with the form of the entities. She avoided and evaded the payment of taxes to the state and federal taxing authorities, *cf. Towe v. Martinson,* 195 B.R. at 143 ("the evasion of taxes is sufficient grounds for piercing the corporate veil"), ignored their form when applying for credit, but now attempts to use the existence of the entities as a shield. Under the cloak of the trust, assets were transferred from one corporation to another and, ultimately, to the Gillespies to pay for all of their personal living and luxury expenses. At best, the trust is a mere tool of the debtor. More aptly stated, however, the cloak of the trust is a subterfuge and the debtor has used this cloak to perpetrate wrong. To permit the debtor to shield her assets in this manner would be an abuse. *See also Freehling v. Flanzbaum (In re Flanzbaum* ), 8 B.R. 971 (Bankr.S.D.Fla. 1981)(self dealing and use of trust by debtor merged legal and equitable interests of the trust, terminating it and subjected trust assets to the claims of debtor's creditors.)

The court concludes that the Carolyn Gillespie Trust is the alter ego of Carolyn Gillespie. Her interest in the trust is not merely an income only interest, but the entirety of the trust, the income and the corpus. Upon the filing of the chapter 7 petition, that interest became property of the estate, 11 U.S.C. § 541(a). Accordingly, the trustee is entitled, and, indeed, obligated, to obtain custody of and liquidate those assets for the benefit of the creditors.

▮ Even if the debtor's interest was only the income from the trust, that amount is sufficiently high to pay all of Carolyn Gillespie's obligations. Although the debtor offered evidence, in the form of expert testimony, that the income interest

of the trust was minute, if not a negative figure, that evidence could not be credited because his assumptions were based upon normal corporate and trust conduct. He was significantly hampered by the fact that the debtor gave him virtually false information from which to form his conclusions. For example, noting that an ordinary corporation would be paying its primary operator and manager a salary, in making the income calculations of the corporations, he calculated in a salary to be paid to Carolyn Gillespie for her work at the liquor store as well as a salary for Ronnie Gillespie for his work at Hard Times, Inc. The debtor neglected to tell her expert, however, that she and her husband had been pilfering the corporate assets for their personal living and recreational expenses. Accordingly, the expert was unaware of the necessity of adding significant dollar amounts back into the income calculus. Another example of the handicap under which the expert was testifying is debtor's failure to advise the expert that the assets of Cal–Ric, Inc., including a condominium in the resort town of Hot Springs, as well as a vacant plot of land, were allowed to lie waste, rather than earning any of their potential income. The debtor's evidence regarding the amount of income being generated from the trust is completely without credibility.

In contrast to the debtor's unsubstantiated assertions, the documentary evidence indicates that the trust could generate a rather high income and, utilizing the standard actuarial tables, the value of that income interest can be determined with ease. Although the debtor's manner of dealing with the trust and corporate bank accounts make it difficult to accurately determine the precise income of the trust, there is sufficient information in the record to support a finding that it is much higher than the figure offered by Agribank of

$30,959,[10] which generates a lifetime income interest of $376,826.75. For example, the Court notes that schedules indicate that her monthly expenses are $2,200, and these amounts do not include the luxury, vehicle or household up-keep spending that is in the record. In addition to the fairly reasonable expenses listed on the bankruptcy schedules, the evidence submitted by Agribank indicates that, on a monthly basis, Carolyn Gillespie pilfered from the trust assets funds for her automobile payment, Ronnie's duck club, cable T.V., cash, gasoline, the odd payment to the IRS, and "salary."[11] Accordingly, after adding these figures conservatively, the debtor receives well over $3,000 per month in income from the trust. This income figure would result in a lifetime income interest of $438,184. It would be even more equitable, however, to adopt the figure of $60,000 in annual income offered by the debtor in her financial statement when she purchased her automobile.[12] Utilizing that figure, the minimal[13] lifetime income interest of the debtor in the trust would be $730,308.

For purposes of this proceeding, however, the court will adopt the more conservative figure of $30,959 offered by Agribank. Accordingly, the court finds that, even if the debtor's only interest is in the income of the trust, that interest is $376,826.75. That amount is property of the estate and, after deducting proper exemptions, available for distribution to the creditors.

## II.

Inasmuch as these figures provide sufficient assets for the trustee to not only pay all administrative expenses, but also pay all unsecured creditors, both the trustee and Agribank indicate that it is unnecessary for the court to make a determination as to the propriety of the claim of exemptions in the IRA's or the smaller household items. Based upon the foregoing, it is

**ORDERED** as follows:

1. The Objection to Exemptions, filed by the chapter 7 trustee on February 12, 2001, is sustained with regard to the claim of exemption in the Carolyn Gillespie trust. All other objections are rendered moot.

2. The Objection to Exemption Claim filed by Agribank, FCB on February 6, 2001, is sustained with regard to the claim of exemption in the Carolyn Gillespie trust. All other objections are rendered moot.

3. The clerk is directed to send a copy of this Order to the United States Attorney as well as to the taxing authorities for the United States and the State of Arkansas.

**IT IS SO ORDERED.**

---

10. This figure is derived from her income tax return. Since it is signed under penalty of perjury, it is not unreasonable to utilize this figure, notwithstanding her complete disregard of the federal and state tax laws.

11. The debtor's income tax returns and bankruptcy schedules claim she receives no salary.

12. As stated above, the debtor's statement that she believed the form was asking for the yearly gross income of the business is not credible.

13. This figure does not take into account the income that may be earned from rental of the condominium, the interest accruing on the other assets in Cal–Ric, Inc., or the farm income from Hard Times, Inc.